(58 South. 881.)

Nos. 18,533, 19,082.

COHN v. TEBAULT.

(May 6, 1912. Rehearing Denied June 19, 1912.)

*(Syllabus by the Court.)*

GAMING (§ 36*)—PURCHASE ON MARGINS—DUTIES OF PARTIES.

Where a broker and his client, after a conversation concerning the advisability of selling certain securities which are held on margin, part, under circumstances which leave a doubt as to each other's real desire and purpose, the client, if fixed in his purpose to sell, should follow up such conversation, and the broker, if fixed in his purpose not to sell, should, at least, again consult his client before the market, which is falling gradually, reaches a point when the sale will involve his client in debt. Where, under such circumstances, neither party acts, the loss will be allowed to rest where it falls.

[Ed. Note.—For other cases, see Gaming, Cent. Dig. § 73; Dec. Dig. § 36.*]

Appeal from Civil District Court, Parish of Orleans; T. C. W. Ellis, Judge.

Action by E. D. Cohn against William G. Tebault. Judgment of nonsuit, and both parties appeal. Affirmed.

Edward Rightor, for appellant. Lazarus, Michel & Lazarus, for appellee.

MONROE, J. Plaintiff having sued defendant on a contract of brokerage and defendant having set up a claim in reconvention, both claims were dismissed, as in case of nonsuit, and, both litigants having appealed, the two appeals have by consent been consolidated. The petition reads, in part, as follows:

"That on or about the latter part of the month of July, 1906, defendant informed your petitioner, who is a stock and money broker in this city, that he desired to purchase and sell certain stocks and bonds upon the floor of the New Orleans Stock Exchange, or upon the curb; that he desired your petitioner to act as his broker therein, to borrow, through his own name, through that of E. M. Stafford, in whose name certain purchases of stocks and bonds were made for account of defendant, and through that of petitioner, various amounts of money in different financial institutions in this city, with the stocks and bonds of defendant as security, and that defendant further offered to pay to petitioner the current market rate of interest and additional brokerage upon all transactions so handled. * * * To this your petitioner agreed, and petitioner made various transactions for defendant's account under said agreement, all of which are fully shown by the detailed and itemized statement, which is hereto attached and made part of this petition. That there is now due and owing to your petitioner on said account * * * the sum of $5,842.24, with 8 per cent. interest, in accordance with defendant's agreement. * * * Wherefore petitioner prays," etc.

The account annexed to the petition appears, for the most part, in the form of letter press copy on thin paper with the entries barely legible or illegible, purporting to show the debit and credit sides of accounts between plaintiff and defendant and plaintiff and Stafford, covering a large number of purchases, sales, loans, interest, and other charges, extending over a period of some 16 months, the whole being hard to decipher and unintelligible when deciphered; plaintiff himself when on the stand as a witness having frequently been obliged to resort to his books (which are not before the court) in order to explain items concerning which he was interrogated. The petition falls very short of the requirement of the Code of Practice that:

"The petition must contain a clear and concise statement of the object of the demand, as well as of the nature of the title or cause of action on which it is founded."

And the plaintiff as a witness fell very far short in his explanation of it. Defendant in his answers (original and supplemental) alleges that:

"This account, as now written out, cannot be relied upon, but, that it becomes necessary to acquire, dehors this account, information as to almost every transaction there suggested and to add this information to, or substitute it for, what said account imports before we can learn what dealings did or did not take place between plaintiff and defendant."

It is alleged that in most instances where plaintiff charges defendant for stocks pur-

chased for his account no such purchases were made, and particular transactions appearing on the account are then attacked as never having taken place. In the end, however, those charges were withdrawn, and, in the brief filed on behalf of defendant, it is said:

"In the trial court counsel for defendant, in their efforts to prove a surcharge and falsification of Cohn's account, entered minutely into all the transactions that figured on that account. The theory of defendant was that Cohn in his speculative dealings with Tebault was not acting fairly as his broker, but was, in the parlance of the street, 'bucketing' Tebault's orders; that is to say, taking the order, and practically betting against the customer's judgment. This feature of the defense may be at once dismissed. It rested entirely upon the suspicions of the defendant, and we think it is satisfactorily shown on the record that the orders were placed by Cohn in the usual course of business. Independently of Cohn's dealings with the railways stock, which he carried for Tebault in his speculative account, we shall not press the claim advanced by the defendant to the other items figuring upon this speculative account. If they possess merit, we are frank to say that the defendant has failed to establish his claim to those items with that reasonable certainty which would invite judicial action. As to the 'railways common,' however, the situation is essentially different; that is, as to the quantity of railways common held by Cohn on June 21, 1907, to wit, 1,260 shares, which he, Cohn, admits he possessed at that time, and which represented in part his purchases for Tebault to the extent of 1,000 shares, and 260 additional, which Tebault placed in Cohn's hands to margin some of the securities which Cohn was carrying for Tebault under his speculative account. We purpose to show from the record that upon the gradual decline of the railways common Tebault gave peremptory orders to Cohn to sell and close out his holdings of all railways common held by him on margin, but that Cohn disregarded the directions of his principal and continued to carry the stock, which he subsequently sold and which entailed a loss, in consequence of the disregard of his principal's orders, representing a sum upwards of $22,000. * * * Every question in this case is eliminated except the sale of railways common, carried by Cohn for Tebault under his speculative account, and as to the time when Tebault gave orders for its sale."

Between July 31, 1906, and March 23, 1907, plaintiff charges defendant with 1,415 shares of "railways common," bought for his account, in addition to which there appears to have come into his hands 260 shares, which had been pledged to secure loans,

making a total of 1,675 shares, without counting 1,115 shares which were pledged to secure a loan obtained in the name of Stafford. Testifying with regard to different lots, included in the total of 1,675 shares, plaintiff says that they were paid for by defendant, and that the certificates were delivered to him, but his testimony is rather a matter of assumption than of recollection, and leaves the question of the amount that was so delivered in doubt. It would seem, however, that in June, 1907, he must still have had on hand 1,000 shares, since he bought none after that date, and, between October 11, 1907, and January 15, 1908, he credits defendant with 1,260 shares sold for his account, the 260 additional shares being those above referred to which he says were given to him as margin for the 1,000 shares. Defendant testifies that on June 21, 1907, he gave plaintiff instructions to sell out the railways common, and there is some corroborative testimony. On the other hand, plaintiff testifies that he had no communication with defendant in June, but that on August 15th he had an interview with him at which he demanded $3,500 or $4,000 as additional margin, and that, at defendant's request, Mr. Stafford, defendant's agent, in whose name some of his operations were carried on, gave him (plaintiff) his (Stafford's) check for $1,744, and Stafford testifies that when he gave that check defendant, to the best of his recollection, was at his office. He states, however, that he does not know or remember for what purpose the check was given, and from the state of the accounts at that time it would appear to have been needed as additional security for the outstanding loan or loans that had been obtained in his name. Defendant testifies that he was very ill at his home on August 15th, and there is some corroboration of that testimony, although, as in most other instances, not as much of it as we should imagine might readily have

been obtained. Plaintiff admits that on August 15th defendant was disposed to sell out the railways common, and gave instructions to that effect, but he says he protested or refused to obey the instructions, and, as to that, there seems to be no doubt, the points of difference being whether the instructions were given on June 21st or August 15th, and, as it appears to us, whether they were so given as to amount to a positive order, or whether defendant did not yield somewhat to plaintiff's objections and to his representation that the attempt to sell would break the market. A lady who was employed by defendant as confidential clerk and cashier, both in June and August, testifies that in June plaintiff telephoned that railways common had fallen to $22 and $22.50, and that, acting under defendant's orders, she answered, telling plaintiff to sell; that plaintiff replied that he would not sell; that it would force the market down, and that he would call and see defendant; that he did come, and that defendant told him "to sell out." On her cross-examination the following question was asked and answered, to wit:

"Q. When Mr. Cohn said, in the office, 'I won't sell you out,' what did Mr. Tebault reply? A. I don't think Mr. Tebault made any reply, but took some paper, and shot it up to the ceiling. He has that habit, anyhow."

It appears to us, therefore, that the parties left the matter in doubt; and if, on the one hand, the conversation took place in June, and Tebault was fixed in his purpose to sell out, he ought, under the circumstances, to have said something more about it between that time and August 15th, at or about which date he was taken sick. On the other hand, whether the conversation took place in June or August Cohn ought, at least, to have again consulted Tebault before the market, which appears to have fallen gradually, reached a point which brought Tebault in debt to him. Upon the whole, and as the case is presented, we conclude that the loss should rest where it has fallen.

The judgment appealed from is therefore affirmed.